**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **WALGREEN CO.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 4:24-cv-10151-MRG** |
| ) | |
| **ARISTEDES HASEOTES AND** ) | |
| **BYRON HASEOTES,** ) | |
| ) | |
| **Defendant(s).** ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS (ECF. No. 28)**

**GUZMAN, J.**

Plaintiff, Walgreen Co. ("Walgreens"), alleges that Defendants Ari and Byron Haseotes repeatedly and intentionally used Walgreens' stolen trade secrets and other proprietary information to purchase property in violation of the Trade Secrets Acts. Walgreens also alleges that Ari Haseotes engaged in a fraudulent scheme to interfere with Walgreens' ability to engage in its contractual and business relationships. Pending before the Court is Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6). [ECF No. 28]. For the reasons set forth below, the Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

**I.     BACKGROUND[1]**

---

[1] On a motion to dismiss, the Court sets forth the facts taking as true all well-pleaded allegations in the complaint and drawing all reasonable inferences in the Plaintiffs' favor. See Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

Walgreens is an Illinois corporation that owns pharmacies throughout the United States. [Compl. ¶ 8, ECF No. 1].[2] Walgreens leases many of its store locations, and its leases contain a Right of First Refusal ("ROFR") provision requiring landlords to provide Walgreens notice and opportunity to bid on the property following an offer for sale before it may be sold to a new owner. [Id. ¶¶ 3, 69]. A landlord of a Walgreens-leased property who receives an offer to sell must give Walgreens a copy of any third-party offer before it is accepted. [Id.]

A third-party, not a party to this action, Aaron Peters,[3] was employed as a Senior Director of Walgreens' Market Planning and Research ("MPR") Department. [Id. ¶ 4]. As Senior Director, Peters helped manage Walgreens' MPR Department and was entrusted with access to raw confidential and proprietary data that Walgreens and Peters could and did use to analyze, track, predict, and make recommendations based on the performance of every Walgreens store nationwide. [Id. ¶ 27]. Walgreens protected this data by adopting and implementing confidentiality policies that all employees, including Peters, were required to review and acknowledge. [Id. ¶¶ 30–33]. Peters and his team also received annual training about confidentiality and protecting trade secrets. [Id. ¶ 34].

In November 2019, a month before his departure from Walgreens, Peters accepted a position with L2 Partners LLC ("L2"). [Id. ¶¶ 37, 2]. L2 is a real estate investment company that buys and sells commercial properties (including Walgreens-leased properties). [Id. ¶ 2]. During the month after

---

[2] All pagination refers to ECF pagination rather than page numbers in the documents.

[3] Walgreens is pursuing a separate action against other parties allegedly involved in the misappropriation of its trade secrets. See Walgreens Co. v. Peters, No. 1:21-cv-02522 (N.D. Ill. May 5, 2021) (the "Chicago Action"). "It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 19 (1st Cir. 2004) (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990))). Further, "the jurisprudence of Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice." Rodi, 389 F.3d at at 12 (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15–16 (1st Cir. 2003)). Accordingly, the Court takes judicial notice of the Chicago Action.

Peters accepted a position at L2 but prior to leaving Walgreens, Peters surreptitiously downloaded large quantities of Walgreens' data from his company laptop directly to an unauthorized external hard drive. [Id. ¶ 37]. Peters stole tens of thousands of sensitive Walgreens files that he later disclosed to L2 (collectively, the "Illegally Obtained Data"). [Id. ¶ 4]. The data obtained included Walgreens' Trailing Twelve-Month Report ("TTM Report"), which contained the total sales, itemized prescription sales, profit margins, operating expenses, and adjusted operating income for every individual Walgreens-leased store in the United States. [Id. ¶¶ 36–38]. Adjusted operating income is one of the primary metrics that Walgreens uses to assess store performance and make business decisions, including whether to exercise an ROFR and purchase Walgreens properties nationwide. [Id. ¶¶ 38–39]. None of the information in the TTM Report is publicly available and is subject to Walgreens' confidentiality policies. [Id. ¶ 38]. Plaintiff alleges if a third party obtained Walgreens' data, "the data could be used to identify high-performing Walgreens Properties and determine the likely price that Walgreens would pay to exercise its ROFR and purchase those properties." [Id. ¶ 39].

When Peters joined L2, he was assigned to its Acquisition Team, which is responsible for identifying high-performing Walgreens Properties for L2 to target. [Id. ¶ 42]. In pursuit of this effort, Peters created pitch-decks for Walgreens Properties to be presented to investors like the Defendants. [Id. ¶ 19]. These pitch-decks described potential target stores' performance using the Illegally Obtained Data and included a financial summary that identified that store's profit, total sales, the number of prescriptions sold each day, and a statement of that store's ranking when compared to all Walgreens locations nationwide—none of which, Walgreens alleges, is publicly available. [Id. ¶ 55]. This information is critical to Walgreens' internal decision-making on whether to renew a lease at a particular location, and whether to exercise its ROFR for a Walgreens property. [Id. ¶ 17]. The

3

Illegally Obtained Data's information on store performance provides critical indications on the profitability and return on investment for a given Walgreens store, which in turn influences Walgreens' decision as to whether it will continue to lease a particular property and pay rent. [Id.]

Walgreens alleges that the Defendants received and used the Illegally Obtained Data to make business decisions. [Id. ¶¶ 21–24, 148]. If the Defendants decided that the Walgreens Property and terms of purchase met their criteria, Defendants would retain L2 pursuant to a Consulting Agreement. [Id. ¶ 60].  In executing their consulting agreements, the Defendants explicitly authorized L2 to provide them with Walgreens' information and to search for information on additional Walgreens properties that matched their criteria. [Id. ¶ 66]. The Defendants would each pay L2 in exchange for their services. [Id. ¶ 65]. Pursuant to these consulting agreements, Byron Haseotes obtained at least two Walgreens properties and Ari Haseotes obtained at least seven Walgreens properties. [Id. ¶¶ 61–64].  The Defendants are highly experienced in real estate transactions. [Id. ¶ 20]. Walgreens alleges that based on their experience, the Defendants "knew or should have known that the detailed and specific information about the Walgreens Properties disclosed in the pitch-decks was not publicly available and contained Illegally Obtained Data." [Id.] Walgreens also alleges that upon information and belief, L2 specifically informed the Defendants that the information was illicitly obtained through the misappropriation of Walgreens' trade secrets. [Id.]

In addition to using the Illegally Obtained Data to the advantage of both Defendants, Walgreens also alleges that L2 and Ari Haseotes engaged in a concerted effort to prevent Walgreens from exercising its ROFR by negotiating inflated purchase prices with the landlord of the properties, withholding material details of the transaction from Walgreens, and preparing fraudulent ROFR Notices. [Id.  ¶ 21]. As a specific example of this conduct, Walgreens highlights the Defendants'

purchase of a Walgreens store located at 1625 S Webb Rd, Wichita, KS (the "Wichita Property"). [Id. ¶ 82–92].

### 1. The Wichita Property Purchase

On or around August 3, 2020, L2 began negotiations to purchase the Wichita Property from its owner/landlord, KS Webb. [Id. ¶ 82]. On August 11, 2020, L2 bargained on behalf of Ari Haseotes, to purchase the Wichita Property for $4,500,000. [Id. ¶ 83]. The purchase price included a $200,000 Partial Refund styled as a "maintenance credit" that Walgreens alleges was not related to the condition of the properties, but rather existed to "deceive Walgreens into believing that the purchase prices were higher than what L2 and Ari Haseotes actually agreed to pay." [Id. ¶¶ 83, 72, 74]. Walgreens alleges the Partial Refunds were utilized in all the L2 purchases and represent an intentional scheme where L2 and the Defendants entered into side agreements with landlords that required the landlords to refund a significant amount of the purchase amounts to Ari Haseotes' Investor Entities at closing. [Id. ¶ 71]. The side agreements were concealed from and never disclosed to Walgreens as part of any ROFR Notice from the landlords or otherwise. [Id.] The objective of the scheme was to fraudulently represent fake purchase prices for these properties to Walgreens that were high enough to deter Walgreens from purchasing the properties through the exercise of its ROFR with respect thereto. [Id.] While he worked at Walgreens, Peters would review confidential information and utilize confidential and propriety metrics to make recommendations in favor of or against Walgreens' exercise of its ROFR. [Id. ¶ 28]. In other words, L2, through Peters, had insider knowledge on Walgreens' inclinations to exercise a ROFR on a property, and utilized this information to inflate the properties' purchase prices to a high enough amount that Walgreens would decline to exercise its ROFR. The investor buying the property would then receive an undisclosed partial refund, lowering the ultimate purchase price.

On August 11, 2020, L2 prepared and executed the ROFR notice for the Wichita Property. [Id. ¶¶ 73, 83]. On August 17, 2020, L2 and KS Webb executed a purchase and sale agreement ("PSA") for the Wichita Property. On August 17 or August 19, 2020, Ari Haseotes received a pitch deck for the Wichita Property from L2.[4] On August 18, 2020, Walgreens received the ROFR Notice for the Wichita Property, which identified a purchase price of $4,500,000 but did not include any terms related to the Partial Refund. [Id. at 84]. Walgreens asserts that L2, as an agent of Ari Haseotes, knew that the statements regarding the purchase price were false, knew that the deficient ROFR notice would be submitted to Walgreens, and knew that Walgreens would rely on the ROFR notice in determining whether to purchase the property. [Id. ¶ 86]. As a result of the deficient ROFR notice, Walgreens did not exercise its ROFR on the Wichita Property. [Id. ¶ 88]. Walgreens alleges that if the notice had disclosed the $200,000 refund, then Walgreens would have exercised its ROFR and purchased the Wichita Property. [Id. ¶ 88].

On August 24, 2020, Ari and L2 signed the Consulting Agreement for the Wichita property, formalizing L2 acting as an agent on Ari's behalf. [Consulting Agreement, ECF No. 30-4]. Back in June 2020, L2 organized DE Webb, a Delaware real estate investor entity. [Compl. ¶ 89]. On August 31, 2020, L2 conveyed DE Webb to Ari. [Id.] On September 22, 2020, L2 agreed to and amended the Purchase and Sale Agreement to provide an increased Partial Refund of $250,000. [Id. ¶ 90].

---

[4] This allegation is not specifically stated in the present Complaint, but Walgreens alleged that Ari received the Wichita pitch deck on August 17, 2020 in its complaint for the Chicago Action, in which Walgreens makes near identical allegations against Ari and Byron as in this case. [See Am. Compl., ECF No. 186-1 in Chicago Action]. In their memorandum in support of their motion, the Defendants say Ari actually received the pitch deck on August 19, 2020. [Def. Mem. at 11 n.5, ECF No. 29]. While the Court is generally constrained to the facts as presented by the complaint at a motion to dismiss, the Court may consider "facts put forward by the defendant only to the extent that they are uncontradicted." Mora v. AngioDynamics, Inc., No. 21-cv-11352-ADB, 2021 U.S. Dist. LEXIS 208157, at *8 (D. Mass. Oct. 28, 2021) (citations omitted). Walgreens has not contradicted the assertion that Ari received the pitch deck on August 19, 2020.

Walgreens did not receive an amended ROFR Notice disclosing a larger Partial Refund. [Id.] On October 7, 2020, L2 assigned its rights to the Wichita Property to DE Webb, now owned by Ari. [Def. Mem. at 12]. The Partial Refund of $250,000 was also paid to DE Webb, a fact concealed from Walgreens. [Compl. ¶ 89]. On October 30, 2020, L2 finalized the purchase of the Wichita Property on behalf of Ari Haseotes for $4,250,000 -- $250,000 less than what was advertised to Walgreens in the ROFR Notice. [Id. ¶ 91].

## 2.  **The Chicago Action**

The Defendants argue Plaintiff's claims against them are barred by the doctrine of issue preclusion as a result of orders in the Chicago Action. [Def. Mem. at 7, 14]. On July 19, 2022, Walgreens filed a Second Amended Complaint ("SAC") in the Chicago Action against Ari, Byron, Peters, L2, and various other individuals and entities it accuses of a conspiracy. ["Chicago SAC," ECF No. 231 in the Chicago Action (No. 1:21-cv-02522 (N.D. Ill.)]. The SAC brought claims against investor defendants including Ari and Byron (collectively, the "Named Investors") that contracted with L2 to buy Walgreens properties. [See id.] Relevant to this action, Walgreens in the Chicago Action brought two claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"): a claim for direct violation of the act and a claim for RICO conspiracy. [Chicago SAC ¶¶ 187–222.  Defendants and the other Named Investors all moved to dismiss the SAC. [ECF No. 291 at 2–4 in the Chicago Action].

In January 2024, the Northern District of Illinois issued a Memorandum Opinion and Order in the Chicago Action ("Chicago Order"). [ECF No. 366 in the Chicago Action]. With respect to Ari and Byron Haseotes, the court determined that the SAC failed to show that the Defendants "conducted or participated in the conduct of the enterprise's affairs, not just [their] own" — a requirement to state a claim for a defendants' liability as part of a RICO enterprise. [Id. at 9 (citing United Food & Com.

<u>Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.</u>, 719 F.3d 849, 854 (7th Cir. 2013))]. The court found that Walgreens had failed to allege anything other than a "business-to-business" relationship between the Named Investors and L2, and accordingly, the Defendants were not part of the RICO enterprise under § 1962(c) and did not "maintain, conduct, or control" that enterprise to establish RICO conspiracy liability under § 1962(d). [<u>Id.</u> at 13–16]. The RICO claims had provided the court with personal jurisdiction over Ari and Byron Haseotes due to the RICO statute's authorization of nationwide service of process.  [<u>Id.</u>] Having dismissed the RICO claims, the court then declined to exercise personal jurisdiction with respect to the remaining claims against Ari and Byron under state law, and the claims were dismissed. [<u>Id.</u> at 31–34].

Because Defendants' dismissal from the Chicago action for all non-RICO claims was on jurisdictional grounds only, Walgreens promptly filed suit in this Court on those claims on January 19, 2024. [ECF No. 1]. On March 14, 2024, the Defendants filed a motion to dismiss the claims for failure to state a claim. [ECF No. 28].

## II.    <u>LEGAL STANDARDS</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007) (citing <u>Rogan v. Menino</u>, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Id.</u> at 555 (citations omitted).

"In resolving a motion to dismiss, a court should employ a two-pronged approach." <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" <u>Id.</u> (alterations in original) (quoting <u>Ashcroft v. Iqbal</u>, 566 U.S. 662, 678 (2009). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." <u>Ocasio-Hernandez</u>, 640 F.3d at 12 (citations omitted). Still, Plaintiff's burden is relatively low as "[a] court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. . . . Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." <u>Afrasiabi v. Massachusetts</u>, 272 F. Supp. 3d 256, 260 (D. Mass. 2017) (citing <u>Ocasio-Hernández</u>, 640 F.3d at 13).

When a complaint alleges state law claims for fraud, the complaint must meet the heightened pleading standard of Federal Rules of Civil Procedure 9(b). <u>N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 13 (1st Cir. 2009) ("Rule 9(b)'s heightened pleading standard applies to state law fraud claims asserted in federal court."). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, Rule 9(b) requires an "averment 'of the who, what, where, and when of the allegedly false or fraudulent representation.'" <u>Rodi</u>, 389 F.3d at 15 (quoting <u>Alt. Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23, 29 (1st Cir. 2004)). "The other elements of fraud, such as intent and knowledge, may be averred in general terms." <u>Rodi</u>, 389 F.3d at 15. However, the complaint must "also identify[ ] the basis for inferring scienter" by setting forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or

9

misleading." <u>Cardinale</u>, 567 F.3d at 13 (citations omitted). The purpose of Rule 9(b)'s heightened pleading standard is to put the opposing party "on notice and enable them to prepare meaningful responses." <u>Spark Energy Gas, LP v. Toxikon Corp.</u>, 908 F. Supp. 2d 267, 270, 270 (D. Mass. 2012) (quoting <u>OrbusNeich Med. Co. v. Boston Sci. Corp.</u>, 694 F. Supp. 2d 106, 118 (D. Mass. 2010)).

## III.    <u>DISCUSSION</u>[5]

### A.    Issue Preclusion

The Defendants argue that the present Complaint is barred by the doctrine of issue preclusion because the Chicago Order dismissed Walgreens' claims against the Defendants. [Def. Mem. at 14]. Issue preclusion bars relitigation of issues that were previously litigated, "even in the context of a suit based on an entirely different claim." <u>In re Sonus Networks, Inc.</u>, 499 F.3d 47, 56 (1st Cir. 2007) (citations omitted). To determine whether the issues in this complaint have been previously litigated, this Court must take judicial notice of the Chicago Action, which it has done (<u>See</u> FN 2, *supra*).

The doctrine of "issue preclusion" applies when: "(1) both proceedings involve[ ] the same issue of law or fact, (2) the parties actually litigated that issue [in the prior proceeding], (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits." <u>Vargas-Colón v. Fundación Damas, Inc.</u>, 864 F.3d 14, 26 (1st Cir. 2017) (quoting <u>Robb Evans & Assocs., LLC v. United States</u>, 850 F.3d 24, 32 (1st Cir. 2017)). Here, the Defendants argue that the Chicago Action and the present action both focus on whether Ari and Byron "engaged

---

[5] In their written submissions, both parties have relied exclusively on Massachusetts law to support their substantive legal claims. Thus, the Court finds that the parties agree that Massachusetts law applies to Plaintiff's state law claims. Accordingly, the Court does not engage in an independent choice of law analysis and applies Massachusetts law to the state law claims. <u>See</u> <u>CVS Pharmacy, Inc. v. Lavin</u>, 951 F.3d 50, 55 n.4 (1st Cir. 2020) ("When the parties have agreed about what law applies, a federal court sitting in diversity need not engage in an independent choice-of-law analysis." (citing <u>Borden v. Paul Revere Life Ins. Co.</u>, 935 F.2d 370, 375 (1st Cir. 1991)).

in a scheme" to defraud Walgreens. [Def. Mem. at 14]. According to the Defendants, "[t]he lack of any 'conspiracy' or 'enterprise' was the basis of dismissal." [Id. at 15]. Thus, in the Defendants own words, the only issue litigated was whether the Plaintiff had sufficiently pleaded that a conspiracy or agreement to defraud existed for its RICO claims.

Defendants, however, ask this Court to find that the remaining claims dismissed for want of personal jurisdiction in the Chicago Action should be precluded in this Court as well because they are based on the same issues as the RICO claims that were dismissed. [Id. at 16]. But such a request directly contradicts the findings in the Chicago Order. The Chicago Order explicitly found that, as to the other Named Investor defendant who was similarly situated to Ari and Byron, Walgreens had failed to show a conspiracy or enterprise for RICO but had plausibly alleged the Investor was liable for Misappropriation of Trade Secrets claims. [Chicago Order at 34].  Accordingly, it cannot be said that the order dismissing the RICO claim on the merits precludes litigation of the non-RICO claims dismissed for want of personal jurisdiction, as the rulings on these claims were based on different issues. Moreover, the Chicago court recently denied a motion by Ari and Byron Haseotes to enter final judgment on the state law claims against them [ECF No. 614 in the Chicago Action], so issue preclusion based on issues in the state-law claims is inappropriate as there has been no final judgment on the merits. See Vargas-Colón, 864 F.3d at 26.

However, the Court recognizes that the Chicago Order's findings on insufficiency of the RICO conspiracy claims against the Named Investors may have some preclusive effect on Count Eight in this action, which alleges conspiracy to commit fraud. Both the Chicago Action and this action involve the same general issue of conspiracy to commit fraud through the Partial Refund scheme, but the issue in the Chicago Action was couched within an analysis on the elements to establish a RICO enterprise. The Chicago court analyzed whether the relationship between L2 and the Named Investors

11

as alleged in the complaint could rise above a mere business-to-business relationship and suffice to show that the Named Investors conducted the affairs of an association-in-fact enterprise. [Chicago Order at 13–15]. While the court mostly confined its analysis to specific RICO elements, it did frame its discussion of whether Plaintiff's allegations could sustain a conspiracy to commit fraud claim against the Named Investors more generally. For example, the Chicago Order found that the Chicago SAC did not describe the Named Investors' participation in the alleged fraud with sufficient detail and lacked evidence regarding the Named Investors' knowledge of the Partial Refund scheme. [Chicago Order at 15]. The question before the Chicago court on the RICO claim was whether "the defendants were engaged in a 'truly joint enterprise where each individual entity act[ed] in concert with the others to pursue a common interest.'" [Chicago Order at 10 (alteration in original) (quoting Haddad v. Am. Home Mortg. Servicing, Inc., No. 18C00731, 2019 U.S. Dist. LEXIS 54473, at *22 (N.D. Ill. Mar. 29, 2019))]. This question of concerted action with a common goal mirrors the elements of conspiracy, but not fraud.[6] Thus, the Chicago court's finding with respect to the Named Investors' knowledge of the scheme went to the concerted action and intentional action aspect required to establish a RICO enterprise. Accordingly, any preclusive effect of the Chicago court's findings should be limited to the issue of assessing whether Plaintiffs have plausibly stated a claim for conspiracy to commit fraud in Count Eight.

The Court finds that the other three elements of issue preclusion are met[7]; however, based on an independent analysis discussed *infra*, it is this Court's conclusion that Plaintiff has failed to state

---

[6] For elements of fraud versus conspiracy under Massachusetts law, see Section C(a) of this opinion, *infra*.

[7] The parties in this action were parties in the Chicago Action that briefed the motion to dismiss, so the parties did "actually litigate" the issue. See Vargas-Colón, 864 F.3d at 26. While the Defendants were dismissed from the Chicago Action due to lack of personal jurisdiction, the court's decision on the RICO allegation was a final decision on the merits where the Court concluded that the complaint

a claim for conspiracy to commit fraud regardless of any preclusion. The Court notes here that the Chicago Order's findings on conspiracy regarding the Named Investors does not have a preclusive effect on this Court's ruling that Plaintiffs have plausibly stated a claim for fraud against Ari Haseotes because that ruling is based on agency principles, and vicarious liability is a different issue than direct liability. See Green v. Cosby, 138 F. Supp. 3d 114, 138–39 (D. Mass. 2015) (citing Restatement (Third) of Agency § 7.03 cmt. b ("In most cases, direct liability requires fault on the part of the principal whereas vicarious liability does not require that the principal be at fault.")). Further, the Chicago court only analyzed whether the RICO claims against the Named Investors were sufficient with respect to the Partial Refund scheme, and did not touch on any facts regarding the alleged misappropriation of trade secrets claim, which was based on the use of the Illegally Obtained Data. [See Chicago Order 13–16]. As a result, the Chicago Order has no preclusive effect on Count Nine in this action, which alleges conspiracy to commit conversion based on the Illegally Obtained Data.

### B.    Claims Against Byron Haseotes

Walgreens alleges that Byron Haseotes "retained L2 to provide Illegally Obtained Data regarding Walgreens and assistance in acquiring numerous Walgreens Properties." [Compl. ¶ 10]. Walgreens' main fact to support this assertion is the allegation that Byron signed at least two Consulting Agreements with L2 for two Walgreens Properties, identified in Figure 1. [Id. ¶ 61(1)]. Figure 1 is simply a list of Walgreens properties and their addresses. Absent are any details regarding the sale of the properties and Defendants' specific actions regarding those properties. For the majority

---

failed to state a RICO claim against the Named Investors and accordingly dismissed Counts II and III against them. [Chicago Order at 16]; AVX Corp. v. Cabot Corp., 424 F.3d 28, 30 (1st Cir. 2005) ("Ordinarily, a dismissal for failure to state a claim is treated as a dismissal on the merits, and there is abundant case law to this effect" (collecting cases)). Lastly, resolution of whether the SAC plausibly alleged that the Investor Defendants had sufficient knowledge of and participation in the fraudulent scheme was essential to the Chicago court's finding that Plaintiffs failed to state a RICO claim.

of the Complaint, Walgreens simply asserts allegations against "each Defendant," but, unlike the specificity of the allegations against Ari regarding the Wichita Property, Plaintiff has failed to articulate specific allegations around the two Walgreens properties Byron allegedly acquired through L2. Still, Plaintiff pleads its case against Byron using Ari's transactions with L2 as a representative example. In opposing the motion to dismiss, Walgreens seeks leave to amend its complaint should the Court find any claim defective. [ECF No. 36 at 21]. Fed. R. Civ. P. 15(a)(2), applicable here, provides that "[t]he court should freely give leave [to amend a complaint] when justice so requires." Id. While Walgreens' allegations against Byron are insufficient as alleged, it has made specific factual allegations regarding a similar transaction between L2 and Ari (the Wichita Property), as well as allegations about the way L2 conducts business with investors like Byron to buy Walgreens properties. It is not apparent that amending the Complaint would be futile,[8] and the Court finds that Walgreens should be afforded an opportunity to put forth further specific facts to state a plausible claim against Byron. Accordingly, Walgreens is granted leave to amend its complaint regarding all claims against Byron Haseotes.

**C.     Partial Refunds and Interference with Walgreens' ROFR**

      **a.    *Claims for Fraud (Counts Seven and Eight)***

            **i.    *Fraud (Count Seven)***

Count Seven asserts that Ari Haseotes used Partial Refunds concealed as maintenance credits to commit fraud against Walgreens. Under Massachusetts Law, a plaintiff bringing a claim for fraud must show "that (1) the defendant made a false representation of material fact, (2) with knowledge of

---

[8] "[C]ourts should grant leave to amend unless they are 'certain from the face of the complaint that any amendment would be futile.'" In re Telexfree Sec. Litig., No. 4:14-md-02566-TSH, 2021 U.S. Dist. LEXIS 232681, at *54 (D. Mass. Dec. 6, 2021) (citing Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Com'n, 377 F.3d 682, 687 (7th Cir. 2004)

its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment.'" Metro. Prop. & Cas. Ins. Co. v. Savin Hill Fam. Chiropractic, Inc., 266 F. Supp. 3d 502, 537 (D. Mass. 2017) (emphasis added) (quoting Fiorillo v. Winiker, 85 F. Supp. 3d 565, 574 (D. Mass. 2015)). A false representation can occur through omission, or "the failure to disclose a material fact." Van v. Am. Airlines, Inc., 370 F. Supp. 3d 218, 232 (D. Mass. 2019). Additionally, for a fraud by omission claim, "a plaintiff must establish defendants' 'concealment of material information' and 'duty requiring disclosure.'" AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., 928 F.3d 110, 122 (1st Cir. 2019) (quoting Sahin v. Sahin, 758 N.E.2d 132, 138 n.9 (Mass. 2001)). A duty to disclose in the context of a tort of deceit like fraud, "arises only in a number of discrete situations described in § 551" of the Restatement (Second) of Torts. Greenery Rehab. Grp. v. Antaramian, 628 N.E.2d 1291, 1294 (Mass. App. Ct. 1994); Restatement (Second) of Torts § 551 (1976).[9] Lastly, this claim is subject to Rule 9(b)'s heightened pleading requirement. See In re Lupron Mktg. & Sales Practices Litig., 295 F.Supp.2d 148, 181–82 (D. Mass. 2003).

---

[9] Here, the Court finds that L2 was under a duty to disclose pursuant to § 551(2)(e) ("One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, . . . facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."). Restatement (Second) of Torts § 551(e). The existence of the Partial Refunds was a material fact because, in effect, the refunds lowered the ultimate purchase price of the Wichita Property. Walgreens alleges that it declined to exercise its ROFR based on the ROFR notice L2 prepared, which omitted the Partial Refunds. [Compl. ¶¶ 83–85, 88, 90]. The customs of real estate transactions, particularly regarding rights of first refusal supports that Walgreens would reasonably expect a disclosure of the Partial Refunds. Additionally, under Walgreens' "typical ROFR[,]" "before a landlord may accept a third-party offer to purchase a Walgreens Property . . . Walgreens is entitled to notice and a copy of the Bona Fide Offer and an opportunity to purchase the Walgreens Property on those same terms." [Id. ¶ 69]. L2 was under a duty to disclose all terms of its offer for the Wichita Property, which should have included the Partial Refunds.

Here, Walgreens provides sufficient allegations that establish the "who, what, where, and when" of the fraud alleged. See Rodi, 389 F.3d at 15. Specifically, Walgreens alleges that in August 2020, L2, acting on behalf of Ari Haseotes, began to negotiate for the purchase of the Wichita Property, [Compl. ¶¶ 82–83]; that L2 was acting on behalf of Ari to negotiate the purchase of Walgreens properties and was bound to keep him informed of all material terms of the purchase, [id. ¶ 157]; and, that on August 11, 2020, L2, acting on behalf of Ari, drafted an ROFR intentionally omitting the Partial Refund term, [id. ¶¶ 83–85]. To establish its harm, Walgreens states it received the fraudulent ROFR on August 18, 2020, [id. ¶ 84], and but for the fraudulent ROFR notice, it would have exercised its ROFR and purchased the property, [id. ¶ 88]. Further, Walgreens alleges that on September 22, 2020, after Ari and L2 had entered into the Consulting Agreement, L2 executed an amended PSA with the owner of the Wichita Property that increased the Partial Refund amount by $50,000, and that these actions were never disclosed to Walgreens, meaning Walgreens was denied another opportunity to exercise its ROFR. [Id. ¶ 90].

Notably, in repetitively pleading its allegations against Ari by stating " L2, acting on behalf of Ari Haseotes," Walgreens advances a vicarious liability theory for its fraud claim. To establish fraud liability against Ari, Walgreens must show that L2 was acting *on behalf* of Ari, in an agency relationship, such that Ari is responsible for L2's actions during the Wichita Property negotiation and purchase. "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2020) (citations omitted). The formation of such agency "depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." Quaak v. Dexia, S.A., 445 F.Supp.2d 130, 144 (D. Mass. 2006) (quoting Itel Containers Int'l Corp. v. Atlanttrafik Express Serv.

Ltd., 909 F.2d 698, 702 (2d Cir. 1990)). A formal agreement between defendants does not need to be established for an agency relationship to exist, although "a formal agency agreement can be dispositive." Bud's Goods & Provisions Corp. v. Doe, 2023 U.S. Dist. LEXIS 53675, at *6–7 (D. Mass. Mar. 29, 2023) (citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 53–55 (1st Cir. 2002)).  Rather, the Court must consider "whether the relationship between the defendants is sufficient to attribute the conduct of one defendant to another." Id.

A "principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." Theo & Sons, Inc., 729 N.E.2d at 1120. "Actual authority results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal." Id. at 1120 n.13. Actual authority may be implied through an agent's conduct to complete a principal's transaction. See Lowell Hous. Auth. V. PSC Int'l, Inc., 759 F. Supp. 2d 104, 108 (D. Mass. 2010). Implied authority may extend beyond the bottom-line transaction. See id. For example, "[a]n agent typically has implied authority to do that which usually accompanies, is incidental to, or reasonably necessary to complete the transaction for which the agent has actual authority." Id. Additionally, "[i]mplied authority may also arise if the principal has repeatedly acquiesced in and adopted similar acts by the agent." Id.

Further, although fraud requires Plaintiff to show that the Defendant knew of the falsity of the representation or omission at issue, Metro. Prop. & Cas. Ins. Co., 266 F. Supp. 3d at 537 (citation omitted), "[w]here an agent has knowledge of a fraud but is acting for his principal, his knowledge *is* imputed to the principal," Nat'l Credit Union Admin. v. Ticor Title Ins. Co., 873 F. Supp. 718, 726 (D. Mass. 1995) (citation omitted). An agent's knowledge is not imputed to the principal where the agent is "engaged in an independent fraudulent act." Id. But the doctrine of imputed knowledge exists

to prevent principals from avoiding liability for fraud committed by their agents while also receiving benefits from the agent's fraudulent acts. Id. ("[T]he principal cannot claim the advantages of the bad acts of its officers without assuming the imputation of their knowledge.").

The Court finds that Walgreens has met its burden of establishing that L2 was acting on behalf of Ari for several reasons. Walgreens first points to the Consulting Agreement between Ari and L2, signed August 24, 2020, that explicitly states that L2 "agrees to negotiate acquisition for the Client's purchase of specific WALGREENS location(s) with current location owners under such terms and conditions directed by the Client[.]" [Compl. ¶ 60]. Defendants argue that the Consulting Agreement cannot be used to establish an agency relationship because the Agreement was signed after L2 had drafted the ROFR notice. [ECF No. 40 at 9–10]. However, even if the Consulting Agreement between Ari and L2 was not signed until after the initial ROFR Notice for the Wichita Property was drafted and submitted, Walgreens has put forth sufficient allegations to find that there was an agency relationship between Ari and L2 that began before the Consulting Agreement became official.

More specifically, Walgreens first asserts that it was L2's practice to obtain specific criteria from investors like Ari, then use the criteria to identify Walgreens properties that the investor might be interested in acquiring. [Compl. ¶ 19]. L2 would use the investor's criteria to locate and convince property owners to sell. [Id.] Walgreens also alleges that prior to issuance of an ROFR Notice, L2 would provide Defendants with pitch-decks that included information about the property, including the Partial Refunds that would be applied to the sale of each property. [Id. ¶¶ 56–57, 76]. As noted previously, Walgreens alleged in the Chicago Action that Ari received the Wichita Property pitch deck as early as August 17, 2020. [See Am. Compl., ECF No. 186-1 in Chicago Action]. Therefore, even if the Consulting Agreement, in and of itself, was not the proof of the start of the agency agreement, it formalizes what Walgreens has sufficiently alleged: L2 first consults with the investor,

here Ari, about their criteria for potential properties, suggests possible properties that match the investor's criteria, and on behalf and on the direction of the investor, L2 negotiates and acquires Walgreens properties. Walgreens has sufficiently alleged that L2 was acting as an agent in fact for Ari before the Consulting Agreement was signed based on L2 conducting transactions on Ari's behalf to acquire the Wichita property. Therefore, Ari is subject to liability as a principal for L2's actions that L2 conducted on Ari's behalf.  See Kansallis Finance Ltd. V. Fern, 659 N.E.2d 731, 736 (Mass. 1996) ("[I]f an agent has actual or apparent authority, the principal is not relieved of liability for that agent's misrepresentation[.]").

Further, Ari's subsequent involvement and knowledge of the increased Partial Refund at the time of the amended  PSA on September 22, 2020 – which was also not disclosed to Walgreens – indicates his understanding and endorsement of L2's fraudulent actions on his behalf. [Id. ¶¶ 90–92]. Additionally, Ari has waived any challenge that L2 was acting beyond the scope of its authority with the Partial Refund scheme because Ari's involvement in the Amended PSA and subsequent acceptance of the Witchita Property mark his ratification of the transaction, and thereby L2's conduct. See Licata v. GGNSC Malden Dexter LLC, 2 N.E.3d 840, 847 (Mass. 2014) ("Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." (quoting Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 204 (Mass. 1997), cert. denied, 522 U.S. 1015 (1997))). "Ratification must be based upon full knowledge of all material facts, subject, however, to the qualification that there may be ratification when one purposely shuts his eyes to means of information within his own possession and control, and ratifies an act deliberately." Licata, 2 N.E.3d at 847  (quoting Kidder v. Greenman, 187 N.E. 42, 48 (Mass. 1933)).  During the time of the amended PSA, the Consulting Agreement was effective, L2 was

contractually obligated to inform Ari of all the actions being taken, and L2 was contractually acting on Ari's behalf. On the facts of the Complaint and Ari's position as a sophisticated real estate investor working with L2 on multiple transactions for Walgreens properties, it is a reasonable inference that Ari was, at a minimum, willfully blind to L2's scheme. But Ari's purposeful avoidance of L2's fraud would not be enough to avoid liability once he ratified the transaction. See Licata, 2 N.E.3d at 847. Even with the heightened pleading standards for fraud claims, at the motion to dismiss stage, the allegations "need only make out plausible claims with all reasonable inferences drawn in the plaintiffs' favor." Lowe v. Mills, 68 F.4th 706, 712 n.10 (1st Cir. 2023). Further, the elements of "intent and knowledge" for fraud claims "may be averred in general terms." Rodi, 389 F.3d at 15. Ari and L2's actions in continuance of the Wichita Property purchase support the Court's finding that Walgreens has plausibly alleged that L2 was acting on behalf of Ari.

Therefore, Walgreens has sufficiently pled that L2, acting on Ari Haseotes behalf, made a false representation of material fact by omitting the Partial Refund in the ROFR; that L2 had knowledge of the Partial Refund scheme (knowledge which is imputed to Ari) or, alternatively, that Ari was willfully blind to the scheme; that the purpose of omitting the Partial Refund was to prevent Walgreens from enacting its ROFR; that Walgreens relied on such representation; and that, as a result, Walgreens did not purchase the property to its detriment. Although the Defendant argues that the Complaint fails to plead particular facts, the Complaint contains sufficient particularity: L2, on behalf of Ari, is the "who"; the omission of the Partial Refund is the "what"; the ROFR Notice is the "where"; and the "when" is August 11, 2020, when L2, on behalf of Ari, drafted the first ROFR Notice, and August 18, 2020, when Walgreens received such notice. See Kaufman v. CVS Caremark Corporation, 836 F.3d 88, 91 (1st Cir. 2016). These elements are likewise met in the same manner utilizing the facts of the execution of the amended PSA and concealment of the increased Partial Refunds from

Walgreens. However. in that circumstance, Ari's position as the "who" for the fraud claim is even stronger, considering the amended PSA was executed after the Consulting Agreement was signed. These allegations are sufficiently specific to apprise the Defendants "as to the nature of the alleged fraudulent conduct and the circumstances in which the alleged non-disclosures took place," and satisfy the purpose of Rule 9(b)'s heightened pleading standard. <u>Spark Energy Gas, LP</u>, 908 F. Supp. 2d at 271 (denying motion to dismiss fraud claim where plaintiff alleged defendant was vicariously liable for the conduct of its agent who failed to disclose a material fact during contract negotiations).

Accordingly, Walgreens has alleged sufficient facts with particularity to state a claim that Ari committed fraud against Walgreens. Thus, Defendants' motion to dismiss Count Seven is **<u>DENIED</u>**.

### ii.  *Conspiracy to Commit Fraud (Count Eight)*

In addition to asserting that Ari Haseotes used Partial Refunds concealed as maintenance credits to commit fraud against Walgreens, Walgreens also alleges a civil conspiracy to do the same. Because this claim is based on fraud, it is subject to Rule 9(b)'s heightened pleading requirement. <u>See</u> <u>Cardinale</u>, 567 F.3d at 15. There are two types of civil conspiracy under Massachusetts law. The first requires Plaintiff to "allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d 1546, 1563 (1st Cir. 1994) (quoting <u>Jurgens v. Abraham</u>, 616 F. Supp. 1381, 1386 (D. Mass. 1985)). The second type of conspiracy, concerted action conspiracy, is a "form of vicarious liability for the tortious conduct of others . . . requiring an underlying tort." <u>Taylor v. Amer. Chemistry Council</u>, 576 F.3d 16, 34-35 (1st Cir. 2009); <u>Greene v. Philip Morris USA Inc.</u>, 208 N.E.3d 676 (Mass. 2023).

"To prove a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted in concert with or pursuant to a common design with the tortfeasor or (2) gave substantial

assistance to the tortfeasor's conduct." <u>Thomas v. Harrington</u>, 909 F.3d 483, 490 (1st Cir. 2018) (citation and internal quotation marks omitted). The "common design" theory requires a plaintiff to show "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." <u>Id.</u> (quoting <u>Aetna Cas. Sur. Co.</u>, 43 F.3d at 1564). The "substantial assistance" theory stipulates, "a person may be liable in tort if he knows that the . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." <u>Thomas</u>, 909 F.3d at 491 (citation omitted) (alterations in original); Restatement (Second) of Torts § 876(b) (1977).  The "substantial assistance" theory also requires the plaintiff to "establish that the defendant had an 'unlawful intent,' consisting of both 'knowledge that the other's conduct is tortious[] and an intent to substantially assist or encourage that conduct.'" <u>Thomas</u>, 909 F.3d at 491 (quoting <u>Taylor</u>, 576 F.3d at 35). Further, there must be "a common plan to commit a tortious act" and the plaintiff must show "the participants [knew] of the plan and its purpose and [took] affirmative steps to encourage the achievement of the result." <u>Kurker v. Hill</u>, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998) (quoting <u>Stock v. Fife</u>, 430 N.E.2d 845, 849 n.10 (Mass. App. Ct. 1982)). Only assistance or encouragement that is a "substantial factor in causing the resulting tort" can lead to liability under this theory. Restatement (Second) of Torts § 876 cmt. d. "Merely showing the defendant's 'general awareness' that their ostensible co-conspirator is engaged in tortious acts is insufficient." <u>Thomas</u>, 909 F.3d at 491 (quoting <u>Kyte v. Philip Morris, Inc.</u>, 556 N.E.2d 1025, 1028 (Mass. 1990)). However, "evidence of an agreement between the defendant and the tortfeasor" is not required. <u>Thomas</u>, 909 F.3d at 491 (quoting <u>Taylor</u>, 576 F.3d at 35–36).

Here, the Complaint makes no allegations that would satisfy the first type of conspiracy. However, it attempts to state a claim for conspiracy under the second theory. Walgreens alleges that

"Ari Haseotes and L2 *agreed* to use the Partial Refunds to fraudulently deceive Walgreens and prevent Walgreens from exercising its ROFR." [Compl. ¶ 168 (emphasis added)]. Further, Walgreens alleges that "Ari Haseotes had actual knowledge that the Walgreens leases required the disclosure of all material terms of any offers to purchase the Walgreens Properties[,]" and that Ari "had actual knowledge that the Partial Refunds were not disclosed to Walgreens and that the purchase prices disclosed to Walgreens in the ROFR Notices were false." [Id. ¶¶ 170–71]. These conclusory statements cannot satisfy the requirements of Rule 12(b)(6), or the heighted pleading standard of Rule 9(b). See Cardinale, 567 F.3d at 14.

While Plaintiff does not have to plead evidence of an agreement between Ari and L2, the Complaint lacks factual support to show Ari's actual knowledge of the underlying fraud. Walgreens provides that Ari directed L2 to "negotiate the purchase of Walgreens Properties on his behalf," [Compl. ¶ 169], but also that L2 drafted the ROFR Notices and "persuaded the landlords of the Walgreens Properties to not include the Partial Refund in the ROFR Notice," [id. ¶ 175]. Although these allegations can support a theory that L2 was acting as Ari's agent when it committed fraud, see supra, it is insufficient to establish Ari's liability in a conspiracy to commit fraud. Instead, Walgreens is required to allege that the defendant himself provided "substantial assistance or encouragement." See Thomas, 909 F.3d at 491. Drawing all inferences in favor of the Plaintiff, Walgreens' alleges that the substantial assistance Ari provided was providing criteria for Walgreens Properties he was interested in and funding the transaction to buy the Wichita Property. As the Chicago Order noted, these actions are features of Ari's business agreement with L2. [See Chicago Order at 14]. Under Massachusetts law, "the provision of routine services may constitute substantial assistance" only "when coupled with actual knowledge of an underlying tort." In re Telexfree Sec. Litig., 2021 U.S. Dist. LEXIS 232681, at *54 (citation omitted). As stated above, the complaint does not sufficiently

allege that Ari himself had actual knowledge of the ROFR scheme. Accordingly, the complaint's allegations fall short of demonstrating that Ari substantially assisted L2 in defrauding Walgreens.

This conclusion is not inconsistent with the Court's ruling on Count Seven. The Court's ruling that Walgreens has sufficiently alleged an agency relationship between Ari and L2 was based on the creation of an agency-in-fact relationship where Ari could be vicariously liable for L2's actions and misrepresentations during the Wichita Property purchase when it was acting on Ari's behalf. Additionally, under the agency theory, L2's knowledge and intent of the fraud is imputable to Ari as the principal to L2. See Nat'l Credit Union Admin., 873 F. Supp. at 726 (citation omitted). Further, the Court found that Plaintiff plausibly alleged that Ari, given his position as a sophisticated real estate investor who acquired multiple Walgreens properties with L2, was – at a minimum – willfully blind to the Partial Refund scheme. Willful blindness may suffice to hold a principal liable for its agent's fraud, but it is not enough to show actual knowledge for the "substantial assistance" conspiracy theory. See Kurker, 689 N.E.2d at 837 (quoting Stock, 430 N.E.2d at 849 n.10) (noting that the "substantial assistance" theory requires that the purported co-conspirators share knowledge of a common plan and its purpose to commit the underlying tort). Because Plaintiffs fail to put forth sufficient, non-conclusory allegations that Ari substantially assisted L2 to commit fraud, Ari Haseotes' Motion to Dismiss is **GRANTED** to Count Eight.

### b.  *Claims for Tortious Interference (Counts Four and Five)*

Counts Four and Five assert that Defendants tortiously interfered with Walgreens' contractual and business relationship that Walgreens had with their landlords. Both Tortious Interference with Contract (Count Four) and Tortious Interference with Advantageous Business Relationship (Count Five) require that a plaintiff show (1) he had an advantageous relationship with a third party (e.g., a contract); (2) the defendant knowingly induced a breaking of the relationship by interfering with that

contract; "(3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)).[10] Because the allegations of Counts Four and Five are based on the same factual allegations as the fraud claim, Rule 9(b)'s heightened standard applies. Cardinale, 567 F.3d at 15 ("[T]he case law here and in other circuits reads Rule 9(b) expansively to cover associated claims where the core allegations effectively charge fraud.").

Here, Walgreens alleges that, for the Wichita Property, "but upon information and belief, other properties as well," Ari induced the landlords of the Walgreens properties to breach the disclosure requirements in the ROFR lease provisions by concealing the Partial Refunds which interfered with Walgreens business/contract relationship with the landlords and effectively deprived Walgreens of its ROFR. [Compl. ¶¶ 134, 142]. Setting aside the Wichita Property, none of Walgreens' allegations against Ari or Byron regarding the eight other properties listed in Figure 1 can satisfy Rule 9(b)'s pleading requirement. Walgreens has failed to allege which of the eight properties Ari or Byron each acquired, which ROFRs Ari or Byron interfered with, who the third party was that had a contractual/business relationship with Walgreens, when any of these interferences took place, or even how Walgreens obtained such information and belief. "Pleadings based on information and belief, without specifying the source of the information and the reasons for the belief, do not pass muster

---

[10] See Hamann, 937 F.3d at 92 ("[U]nder Massachusetts law, the tort of interference with an advantageous business relationship apparently includes within its ambit the tort of wrongful interference with an existing contract, and Massachusetts courts 'have not consistently distinguished between the two torts.'" (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 n.6 (Mass. 1990)).

under the First Circuit interpretation of Rule 9(b)." <u>Lirette v. Shiva Corp.</u>, 27 F. Supp. 2d 268, 275 (D. Mass. 1998) (citing <u>Romani v. Shearson Lehman Hutton</u>, 929 F.2d 875, 878 (1st Cir. 1991)).

However, as to the Wichita Property, Walgreens has provided sufficient information to support tortious interference claims against Ari. Specifically, as discussed in depth with the fraud count, Walgreens has demonstrated that it had a contract/business relationship with the property owner of the Wichita Property, KS Webb. [Compl. ¶¶ 73, 80–85]. The contract required Walgreens to receive ROFR Notices conveying all material terms of any proposed purchase of the property. [<u>Id.</u> ¶ 73]. L2, on behalf of Ari, drafted an ROFR notice that knowingly omitted the Partial Refund. [<u>Id.</u> ¶ 84]. The purpose of the interference was to prevent Walgreens from enacting its ROFR and but for the fraudulent ROFR, it would have exercised its ROFR and purchased the property. [<u>Id.</u> ¶ 88]. Therefore, Walgreens has sufficiently pled that L2, acting on Ari Haseotes behalf, tortiously interfered with Walgreen's contractual and business relationship with KS Webb during the Wichita Property purchase.

For the reasons discussed here and in the Fraud section, *supra*, Walgreens has pled sufficient facts with particularity to state a claim that the Ari, vicariously, tortiously interfered with Walgreens' relationship with the owner of the Wichita Property. Therefore, Ari's motion to dismiss Count Four and Five is **<u>DENIED</u>**. However, based on the complaint as it stands, any future recovery for these claims will be limited to the allegations of the Wichita Property purchase. The Court gives Walgreens leave to amend its Complaint to state allegations that are specific to the other eight properties. If Walgreens fails to provide further factual support, the transactions for the other properties listed in Figure 1 cannot be the basis for damages should Plaintiff prevail.

### D. Trade Secrets Theft

#### a. *Claims for Misappropriation of Trade Secrets (Counts One and Two)*

26

Counts One and Two assert that Defendants misappropriated Walgreens' trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Massachusetts Uniform Trade Secrets Act ("MUTSA")[11], M.G.L. c. 93, § 42. The DTSA and MUTSA are nearly identical and to establish a claim for misappropriation under either statute, a plaintiff must show "(i) the existence of a trade secret; (ii) that the plaintiff took reasonable steps to protect its confidentiality; and (iii) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." T.H. Glennon Co. v. Monday, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *39 (D. Mass. Mar. 17, 2020) (citations omitted); Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

Massachusetts law defines a trade secret as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." Mass. Gen. L. Ch. 266 § 30(4). "A trade secret may consist of any formula, pattern, device or *compilation of information* which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it." T.H. Glennon Co., 2020 U.S. Dist. LEXIS 45917, at *41 (emphasis added) (quoting J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 729 (Mass. 1970)). A compilation of information,

---

[11] Plaintiff's Complaint brought Count Two's misappropriation claim under Illinois' version of the Uniform Trade Secrets Act ("USTA"). The Complaint, however, also stated that in the alternative, the claim could proceed under various state's versions of the Uniform Trade Secrets Act, such as Oklahoma, Texas, Missouri, Ohio, New Hampshire, Wisconsin, Kansas, Arkansas, and Massachusetts. [Compl. ¶ 119]. Because the Court has determined that it will apply Massachusetts law to the state-law claims, and because the Plaintiff has opted to proceed under the Massachusetts version of the UTSA, [ECF No. 36 at 12], the Court will analyze Count Two according to the Massachusetts Uniform Trade Secrets Act, M.G.L. c. 93, § 42.

in which some of the information is publicly available, is still a trade secret if "that information is, as a result of a business' efforts, combined in a unique way." Picker Int'l Corp. v. Imaging Equip. Servs., Inc., 931 F. Supp. 18, 38 (D. Mass. 1995) (holding that equipment service manuals compiled by company that included public information was a trade secret because the manuals were produced for employee use only and contained some of the company's proprietary information) (citing ISC-Bunker Ramo Corp. v. Altech, Inc., 765 F. Supp. 1310, 1321-22 (N.D. Ill. 1990)). Compiled information may also be considered a trade secret based on the "the value of the information to the employer and to his competitors." T.H. Glennon Co., 2020 U.S. Dist. LEXIS 45917, at *41, *44 (quoting Jet Spray Cooler, Inc. v. Crampton, 282 N.E.2d 921, 925 (Mass. 1972)).

Here, the Illegally Obtained Data, such as the TTM report, constituted protected trade secrets. The report was comprised of "the total sales, itemized prescription sales, profit margins, operating expenses, and adjusted operating income for every individual Walgreens store in the United States." [Compl. ¶ 36]. Walgreen's "investment of time and resources to collect, organize, and compile that information into" a report furthers supports its designation as a trade secret. See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, No. 4:21-cv-10572-TSH, 2021 U.S. Dist. LEXIS 132167, at *37 (D. Mass. July 15, 2021) ("KPM's investment of time and resources to collect, organize, and compile that information into datasets for particular constituents that can be utilized in conjunction with its NIR spectroscopy equipment renders them protected."). Walgreens alleges that it used the Data and TTM Report for business decisions involving mergers and acquisitions, lease terms, decisions to exercise its ROFR, and to identify potential new markets. [Compl. ¶¶ 27–28]. These facts demonstrate the strong value that the information had on Walgreens and to its competitors. Furthermore, these reports were not made publicly available. [Id. ¶ 38]. These allegations are sufficient to establish that the TTM report and the Illegally Obtained Data at issue are trade secrets.

To satisfy the requirements of misappropriation, Walgreens must also demonstrate that it took reasonable steps to preserve the secrecy of the information. This is because "a trade secret must be a secret; '[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.'" FabriClear, LLC v. Harvest Direct, LLC, 481 F. Supp. 3d 27, 35 (D. Mass. 2020) (quoting Iconics, Inc. v. Massaro, 266 F. Supp. 3d 449, 452 (D. Mass. 2017)). Walgreens provides sufficient information that the data and TTM Report were only accessible through a "Walgreens-owned laptop" to which only certain employees had access. [Compl. ¶ 29]. Walgreens also adopted multiple policies for its employees who had access to the Walgreens-owned laptop, such as a "Protection of Confidential Information Policy", and a "Global End User Security Policy." [Id. ¶¶ 30–32]. Walgreens further implemented annual trainings and information regarding confidentiality and the need to protect Walgreen's trade secrets. [Id. ¶ 34]. Walgreen's data and TTM report were not available to the public, were only accessible on certain computers that only some employees had access to, and Walgreens implemented multiple steps to prevent employees from sharing the data with the public. These allegations establish that Walgreens took reasonable steps to preserve the secrecy of the TTM report and the Illegally Obtained Data.

The final requirement for a misappropriation of trade secrets claim is that the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret. T.H. Glennon Co., 2020 U.S. Dist. LEXIS 45917, at *39 (citation omitted). In this case, the Complaint alleges that Defendants obtained Walgreen's trade secrets from Peters and L2, not from Walgreens directly. However, "[u]nder Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." KPM Analytics, 2021 U.S. Dist. LEXIS 132167, at *39 (quoting Data Gen. Corp. v. Grumman Sys. Support Corp., 795 F. Supp. 501, 507 (D.

Mass. 1992), aff'd, 36 F.3d 1147 (1st Cir. 1994)). The Supreme Judicial Court of Massachusetts has similarly held that "a corporation which received and used a competitor's trade secrets from a third party could be liable for misappropriation under state law . . . [when] the corporation who received it had notice that the third party had a duty to keep it secret." KPM Analytics, 2021 U.S. Dist. LEXIS 132167, at *39 (citing Curtiss-Wright Corp. v. Ede-Brown Tool & Die Co., 407 N.E.2d 319, 323–24 (Mass. 1980)). The plain text of the DTSA also "implies that a defendant can be liable for inducing a third party to disclose confidential information in breach of a confidential relationship." KPM Analytics, 2021 U.S. Dist. LEXIS 132167, at *39–40. Particularly, 18 U.S.C. § 1839(5) defines misappropriation broadly to include disclosure or use of another's trade secret by someone who had knowledge or reason to know that the trade secret was obtained through improper means or acquired by someone who had a duty to maintain the secrecy of such trade secret. Id. § 1839(5). This statutory language of the DTSA is very similar to the language of the MUTSA, which courts have determined contemplates third-party liability. See KPM Analytics, 2021 U.S. Dist. LEXIS 132167, at *39 (citing Curtiss-Wright Corp., 407 N.E.2d at 323–24). Here, Walgreens alleges that the Defendants knew or had reason to know that the data in the pitch decks was misappropriated due to the Defendants' sophisticated experience in real estate transactions with L2, transactions that were specifically for Walgreens properties. [Compl. ¶¶ 54–59]. In essence, Walgreens asserts that the Defendants knew or should have known that the information contained within the pitch decks was not publicly available information and contained stolen, illegally obtained data. [Id.] Drawing all inferences in favor of the Plaintiff, the Court finds Walgreens' assertion here plausible.

Walgreens has sufficiently alleged that the TTM report, and the Illegally Obtained Data within, were trade secrets that Peters downloaded in violation of a confidential relationship and in violation of Walgreen's explicit policies and procedures. [Id. ¶¶ 25–40]. Walgreens then pleads that

this information was provided by Peters via L2 to the Defendants through pitch-decks and that, based on their sophisticated experienced in real estate transactions, the Defendants knew or should have known that the information was misappropriated. [Id. ¶¶ 54–59]. Walgreens finally pleads that the Defendants used the trade secrets to make real estate purchasing decisions and ultimately acquire Walgreens properties throughout the United States. [Id. ¶¶ 60–68]. Therefore, Walgreens has proffered sufficient facts to state a plausible claim that the Defendants have misappropriated trade secrets under both DTSA and MUTSA. Thus, Defendants' motion to dismiss Counts One and Two is **DENIED**.

### b. *Claim for Unjust Enrichment (Count Three)*

Counts Three asserts that Defendants have been unjustly enriched at Walgreens' expense based on the Defendants' misappropriation of Walgreen's trade secrets. Unjust enrichment provides "an equitable stopgap" by requiring a "person who has been unjustly enriched at the expense of another . . . to make restitution to the other." Mass Eye. & Ear Infirmary v. QLT Phototherapeutics, Inc. (I), 412 F.3d 215, 234 (1st Cir. 2005). To state a claim for unjust enrichment under Massachusetts law, "a plaintiff must prove '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances [which] would be inequitable without payment for its value.'" AnywhereCommerce, Inc. v. Ingenico Inc., 665 F. Supp. 3d 181, 199 (D. Mass. 2023) (alteration in original) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc. (II), 552 F.3d 47, 57 (1st Cir. 2009), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009)). Additionally, "Massachusetts courts have recognized that misuse of confidential information may lead to unjust enrichment." Mass. Eye & Ear Infirmary (II), 552 F.3d at 57. However, "[u]nlike trade secrets law, which will allow recovery against a defendant who received the plaintiff's trade secret

from a third party, unjust enrichment requires that the plaintiff *directly* bestowed a benefit on the defendant." <u>KPM Analytics</u>, 2021 U.S. Dist. LEXIS 132167, at \*47 (emphasis added).

Therefore, a claim must be dismissed that "fails to state the benefit was 'conferred upon the defendant *by the plaintiff*.'" <u>See</u> <u>Blake v. Pro. Coin Grading Serv.</u>, 898 F. Supp. 2d 365, 390 (D. Mass. 2012) (quoting <u>Mass. Eye & Ear Infirmary (II)</u>, 552 F.3d at 57). Here, the complaint alleges that Walgreens' trade secrets were conferred upon the Defendants by Peters/L2, not Walgreens directly. Where a defendant, like the present case, is "too far removed" from the alleged exchange of benefits, no "unjust enrichment theory" can lie. <u>Blake</u>, 898 F. Supp. 2d at 390–91. Accordingly, Defendants' motion to dismiss Count Three is **<u>GRANTED</u>**.

### c. *Claims for Conversion (Counts Six and Nine)[12]*

#### i. *Conversion (Count Three)*

Walgreens has met its burden in stating a claim for conversion on the theory that Defendants converted Walgreens' Illegally Obtained Data. To prevail on a claim for conversion under Massachusetts law, a plaintiff must show that

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiffs demand for its return was refused.

<u>United States v. Peabody Const. Co., Inc.</u>, 392 F.Supp.2d 36, 37 (D. Mass. 2005) (quoting <u>Evergreen Marine Corp. v. Six Consignments of Frozen Scallops</u>, 4 F.3d 90, 95 (1st Cir. 1993)).

---

[12] Counts Six and Nine are brought in the alternative to Counts One and Two. Federal Rule of Civil Procedure 8(d) allow Plaintiffs to "pursue both theories at the pleading stage." <u>Lass v. Bank of America, N.A.</u>, 695 F.3d 129, 140 (1st Cir. 2012).

Count Three asserts two theories of conversion. First, that "Defendants received and continue to possess the Illegally Obtained Data including, but not limited to the TTM report." [Compl. ¶ 148]; and, second, that Defendants "received and continues to possess and retain Walgreens Properties . . . ," [id. ¶ 151]. As to the second theory, this claim must fail because conversion is inapplicable to real estate. Conversion can only apply to injury of personal property, not real property. Andersen v. Lasalle Bank Nat'l Ass'n, No. 15-30107-MGM, 2016 U.S. Dist. LEXIS 71240, at *22 (D. Mass. June 1, 2016) ("Massachusetts law only recognizes a cause of action for conversion of personal property, not real property." (citing Mass Eye. & Ear Infirmary (I), 412 F.3d at 230)); Roachford v. Sovereign Bank, N.A., No. 12-10168-GAO, 2013 U.S. Dist. LEXIS 319, at *4 (D. Mass. Jan. 2, 2013) ("Conversion cannot be maintained for injury to real estate and is appropriate exclusively to the recovery of damages for the unlawful conversion of personal property." (citation and internal quotation marks omitted)). Thus, Plaintiffs' theory of conversion cannot proceed on the basis that Defendants wrongfully acquired Walgreens' real estate properties.

As to the first theory, Defendants argue that the Illegally Obtained Data constitutes intellectual property for which no theory of conversion can apply. [ECF No. 29 at 25]. However, "intangible property rights may be the subject of conversion if they 'customarily merge in or identify with certain kinds of documents.'" Blake, 898 F. Supp. 2d at 387 n.14. Here, Walgreens alleges that the data was merged with a TTM report, and therefore constitutes physical property capable of being converted. Walgreens has sufficiently alleged that Peters took the TTM report and provided it to the Defendants in the form of pitch decks. At the motion to dismiss stage, it is reasonable to infer that Peters downloaded data into a physical format and provided this data to the Defendants in the form of pitch decks. See KPM Analytics, 2021 U.S. Dist. LEXIS 132167, at *46 ("[I]t is reasonable to infer at the motion to dismiss stage that at some point [plaintiff's] trade secrets were transmitted between

electronic devices or were converted to a physical format, especially as pertaining to the information [plaintiff] alleges [the third party] diverted from his [plaintiff] laptop to produce the application notes."). Plaintiff has plausibly alleged that the TTM report and Illegally Obtained Data were taken from Walgreens, downloaded and merged into physical formats, and then provided to the Defendants. Thus, the Illegally Obtained Data does provide a basis for Plaintiff's conversion claim.

Turning to the elements, Walgreens can establish that it had a possessory interest in the Data at the time of conversion, and that it was injured by Defendants' conversion of the property in that the Illegally Obtained Data was used to prevent Walgreens from exercising its ROFRs. Regarding the first element that Defendants intentionally and wrongfully exercised control over the Data, Walgreens' claim for conversion "cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property." Kelley v. Laforce, 288 F.3d 1, 12 (1st Cir. 2002) (citation omitted). As discussed in the trade secrets section, *supra*, Walgreens sufficiently alleges that Defendants knew or had reason to know the TTM report and Illegally Obtained Data were misappropriated due to their experience as sophisticated real estate investors working with L2 to acquire multiple Walgreens properties. Similarly, Defendants' intentional and "positive wrongful act" for conversion is the continued possession and use of the Data in Defendants' own real estate transactions, despite knowledge that it was stolen. See id. Defendants have not raised a good-faith defense, but, even if they did, "[i]t is no defense to conversion for defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." Id. at 12.

Accordingly, Defendants' Motion to Dismiss Count Three is **DENIED** but the claim is limited only to the conversion of the "Illegally Obtained Data including, but not limited to the TTM report." [See Compl. ¶ 148].

### ii.   *Conspiracy to Commit Conversion (Count Nine)*

In addition to asserting that Defendants received and continue to use Illegally Obtained Data, Walgreens also alleges a civil conspiracy to do the same. As discussed *supra*, III.B.a.ii., there are two types of civil conspiracy under Massachusetts law. Of relevance to this claim is the second type of conspiracy, the concerted action theory, which applies when there is either (1) "a common design or an agreement . . . to do a wrongful act" and "proof of some tortious act in furtherance of the agreement," or (2) "substantial assistance or encouragement" to another's tortious act, with "an 'unlawful intent,' consisting of both 'knowledge that the other's conduct is tortious[] and an intent to substantially assist or encourage that conduct.'" Thomas, 909 F.3d at 490–91.

Here, Plaintiff alleges that "Defendants and L2 agreed to use the Illegally Obtained Data to target high-performing Walgreens stores." [Compl. ¶ 181]. However, this is a conclusory statement and not enough to state a claim for civil conspiracy. See Ahanotu v. Massachusetts Turnpike Authority, 466 F. Supp. 2d 378, 389–90 (D. Mass. 2006) (holding conclusory statements, such as "that the defendants had an agreement" to commit a tort, are "not [] enough to sustain a claim for civil conspiracy."). Walgreens has not provided any factual support that an agreement to convert the Illegally Obtained Data took place, what the terms of the agreement were, nor when the agreement took place. While "evidence of an agreement between the defendant and the tortfeasor" is not required, Thomas, 909 F.3d at 491 (quoting Taylor, 576 F.3d at 35–36), Walgreens still fails to allege that Defendants had knowledge of a common plan and its purpose to commit conversion. See Kurker, 689 N.E.2d at 837 (quoting Stock, 430 N.E.2d at 849 n.10). Walgreen has also failed to demonstrate that the Defendants took any affirmative, let alone substantial, actions to assist in the initial conversion of the Illegally Obtained Data. Notably, Walgreen's allegations highlight that Peters began downloading Walgreen's Illegally Obtained Data prior to L2 beginning its relationship with the

Defendants. [Compl. ¶¶ 37, 46]. It would be unreasonable for the Court to infer that the Defendants somehow substantially assisted or encouraged L2 to obtain the data on their behalf. Instead, the allegations demonstrate that after L2 gained access to the Illegally Obtained Data and presented it to the Defendants, the Defendants took possession and control over the Data, knowing that it was stolen. [Id. ¶ 183]. This allegation simply establishes that the Defendants themselves converted Walgreens properties, not that they "gave substantial assistance to the tortfeasor's conduct" or encouraged the tortfeasor to convert Walgreen's property. See Thomas, 909 F.3d at 490.

Accordingly, Plaintiffs have failed to plead any factual allegations that the Defendants entered into an agreement to commit conversion or that the Defendants substantially assisted L2 to convert Walgreen's property. Thus, Defendants Motion to Dismiss is **GRANTED** to Count Nine.

## IV.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss [ECF No. 28] is **GRANTED in part and DENIED in part**.


**SO ORDERED.**

Dated: March 31, 2025

 /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge